**UNITED STATES v. THURSTON COUNTY, NEB., et al. (four cases).**

Civil Actions Nos. 235, 246, 247, 299.

District Court, D. Nebraska,
Omaha Division.

Feb. 23, 1944.

Joseph T. Votava, U. S. Atty., of Omaha, Neb., for plaintiff.

Alfred D. Raun, Co. Atty., of Pender, Neb., and Walter R. Johnson, Atty. Gen., of Nebraska, and H. Emerson Kokjer, Asst. Atty. Gen., of Nebraska, for defendants.

DELEHANT, District Judge.

Of these four cases which have been tried together after consolidation for trial through approved stipulation, number 235 consists of eight counts; number 246 of a single count; number 247 of four counts; and number 299 of eight counts. In each count, the plaintiff in its sovereign capacity as Trustee and Guardian for the Winnebago or Omaha Indian holder or holders of title (subject to restrictions against alienation or encumbrance except with the approval of the Secretary of the Interior) to a parcel of real estate designated and described in the count, and purchased prior to 1936 out of the trust or restricted funds of an individual Indian or of individual Indian demands, against the corporate defendant, the County of Thurston in the state of Nebraska, within whose territorial boundaries all of the real estate is located, and against its taxing and tax collecting authorities who are the other defendants, injunctive relief against the future taxation of the described real estate for the purposes of the state, county and

other domestic taxing agencies until the congress of the United States shall permit such taxation; the cancellation of taxes theretofore levied and assessed upon said real estate, in all instances inclusive of taxes for the year 1937 and thereafter, and in some including taxes for the year 1936; a judgment for the recovery of such of said taxes as were paid prior to suit in order to prevent sale for taxes of the real estate; and for general equitable relief.

The alleged ownership of the lands, their purchase out of the trust or restricted funds of individual Indians, the imposition upon the titles of the asserted restrictions against alienation or encumbrance, the selection by the respective owners with the approval of the Secretary of the Interior of the lands to be identified as 'homesteads and the classification of the selected property either as agricultural and grazing lands not exceeding in any instance a total of one hundred sixty acres, or as village, town or city property not exceeding in cost $5,000 in any instance save one (vide Title 25 U.S.C.A. § 412a, quoted infra) are either admitted or established by stipulation. Each of the several parcels of real estate involved in the cases was formerly owned and held in fee simple by persons quite unconnected with Indian administration; was prior to 1936 on the Thurston county, Nebraska, tax rolls and lawfully taxed during both its non-Indian and its Indian ownership, and, but for the acts of congress hereinafter quoted, would still be taxable.

The statutes upon which the plaintiff relies are:

Section 2 of the Act of Congress of June 20, 1936, 49 Stat. 1542, the material language of which is:

"All lands the title to which is now held by an Indian subject to restrictions against alienation or encumbrance except with the consent or approval of the Secretary of the Interior, heretofore purchased out of trust or restricted funds of said Indian, are hereby declared to be instrumentalities of the Federal Government and shall be nontaxable until otherwise directed by Congress."

And the Act of May 19, 1937 amendatory of the foregoing section, and still effective (50 Stat. 188, Title 25 U.S.C.A. § 412a), of which the pertinent language is:

"All homesteads, heretofore purchased out of the trust or restricted funds of individual Indians, are hereby declared to be instrumentalities of the Federal Government and shall be nontaxable until other-wise directed by Congress; Provided, That the title to such homesteads shall be held subject to restrictions against alienation or encumbrance except with the approval of the Secretary of the Interior: And provided further, That the Indian owner or owners shall select, with the aproval of the Secretary of the Interior, either the agricultural and grazing lands, not exceeding a total of one hundred and sixty acres, or the village, town, or city property, not exceeding in cost $5,000, to be designated as a homestead."

The defendants resist the demands of the plaintiff principally on the ground that the attempted congressional absolution of the identified real estate in the state of Nebraska from state taxation is beyond the power of the national government and void.

■ In approaching its decision the court is urged by the plaintiff to sustain its position because, in the face of claims made by the defendants essentially similar to those now made on hearing upon the merits, the senior judge of this district early in the progress of the cases overruled and denied separate motions of the defendants to dismiss the cases for the asserted failure of the complaints to state claims on which relief could be granted. The rule is invoked that in multiple judge districts one judge will not vacate or reverse the prior rulings in the same case of one of his brethren of the bench. The rule may be acknowledged. But it has no application here. The court is now invited by the defendants not to disregard or vacate the former preliminary rulings in the separate cases, but rather to determine the cases on their merits with the evidence fully before the court. It will approach that task in like manner as if the presently ruling judge had heard and ruled upon the several motions to dismiss. And it may not be amiss to note that the judge now disposing of the cases is persuaded that the ruling on the motions to dismiss was entirely correct.

■ The insistence that a ruling adverse to the defendant upon a motion to dismiss admonishes the court to a position favorable to the plaintiff at the trial upon the merits if the evidence does not essentially depart from the averments of the complaint reflects an unrealistic appraisal of the office of the motion to dismiss under Rule 12(b) (6), 28 U.S.C.A. following section 723c. Such a motion no longer tests whether the complaint affirmatively states a cause of action. The rule is that it

should be denied, though the complaint be infirm, if it is reasonably conceivable that at the trial upon the merits the plaintiff might establish a cause of action. Cohen v. United States, 8 Cir., 129 F.2d 733; Tahir Erk v. Glenn L. Martin Co., 4 Cir., 116 F.2d 865; Boston Casualty Co. v. Bath Iron Works Corporation, 1 Cir., 136 F.2d 31. The cause of action must be proved by evidence on the trial. It need not necessarily be averred with precision in the complaint. So, a complaint may be invulnerable to a motion to dismiss for failure to state a claim upon which relief can be granted, and in the same case, the action may be dismissed on the merits at the trial for failure to establish a cause of action, even though every fact formally pleaded in the complaint be proved. The evidence on final submission is tested more critically than the pleading, when confronted by motion to dismiss. Finally, in the ruling on a motion to dismiss, doubt should ordinarily be resolved against the motion; whereas, upon trial on the merits, doubt usually inclines the scale adversely to him who has the burden of proof, or, upon the plaintiff's case, against him.

During the pendency of these cases the major constitutional issue appears to the court to have been determined with finality in favor of the plaintiff. The issue has been squarely presented; and it has been held that the action of the Congress in according lands of this character the privilege of exemption from state taxation is within its legislative power, and that the two cited sections are constitutional. Board of County Commissioners v. Seber, 318 U. S. 705, 63 S.Ct. 920, 87 L.Ed. 1094, affirming Board of County Commissioners v. Seber, 10 Cir. 130 F.2d 663, which modified and, as modified, affirmed Seber v. Board of County Commissioners, D.C.Okl., 38 F. Supp. 731. See also: Muskogee County, Oklahoma, v. United States, 10 Cir., 133 F. 2d 61; Board of County Commissioners of Pawnee County Okla. v. United States, 10 Cir., 139 F.2d 248; United States v. Nez Perce County, Idaho, D.C.Idaho, 50 F. Supp. 966. The directly pertinent ruling in Board of County Commissioners v. Seber, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094, is not neutralized by the note to Oklahoma Tax Commission v. United States, 319 U. S. 598, 602, 63 S.Ct. 1284, 87 L.Ed. 1612. In the case last cited the Supreme Court held that in the absence of congressional exemption from state inheritance taxation, certain of the property of deceased Indians

was subject to such tax. The note in question merely observes that the question of the power of Congress to exempt the estates in question from inheritance taxation by the state is not foreclosed by Board of County Commissioners v. Seber, supra. The note and the case in which it appears, serve rather to fortify than to discredit the opinion in Board of County Commissioners v. Seber, supra.

The Supreme Court having thus unequivocally affirmed the validity of the statutes under consideration, it would be altogether presumptuous for this court to examine, or assume to sustain, its conclusion. And that will not be undertaken. The court will merely give brief consideration to certain earnestly supported distinctions by which the defendants seek to obviate the application of the opinion in the Seber case to these proceedings.

A distinction is said to lie in the fact that in the enabling act under which statehood was granted to Oklahoma, there is a clause, which has no counterpart in the Nebraska enabling act, whereby the Congress of the United States was expressly recognized as having and retaining the power and right to legislate respecting, and to control, lands owned by Indians. The directly material language of the Oklahoma enabling act is as follows: "Nothing contained in the said constitution shall be construed * * * to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this Act had never been passed". Section 1. It is supplemented by comparable language in the Oklahoma state constitution.

It is true that reference was made in Board of County Commissioners v. Seber, 10 Cir., 130 F.2d 663, 668, to that language and to the settled constitutional and legislative policy of Oklahoma in furtherance of it, by way of support for the circuit court's ruling sustaining the constitutionality of the congressional acts here involved. But that was not premised as its only foundation, or even its primary basis. The very paragraph of the opinion, in which the allusion to the enabling act is made, opens with the clause: "Aside from the historically paramount power of Congress to legislate for and on behalf of its Indian wards." That is the underlying consid-

eration. Then, upon its final appeal, the case was decided by the Supreme Court of the United States wholly without reliance upon the Oklahoma enabling act.

■ Doubt may be entertained (though decision need not here be made) whether the cited language of the Oklahoma enabling act confers upon the Congress any power to legislate with effective applicability within the state of Oklahoma, which it would not have possessed without the language. And that doubt is fortified by authority. Coyle v. Smith, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853; Ex Parte Webb, 225 U.S. 663, 32 S.Ct. 769, 56 L.Ed. 1248; Mashunkashey v. Mashunkashey, 191 Okl. 501, 134 P.2d 976. Thus, in Ex Parte Webb, supra [225 U.S. 663, 32 S.Ct. 779, 56 L.Ed. 1248], the Supreme Court of the United States, quoting with approval from the earlier case of Coyle v. Smith, supra, said: "It may well happen that Congress should embrace in an enactment introducing a new state into the Union legislation intended as a regulation of commerce among the states, or with Indian tribes situated within the limits of such new state, or regulations touching the sole care and disposition of the public lands or reservations therein, which might be upheld as within the sphere of the plain power of Congress. But in every such case such legislation would derive its force not from any agreement or compact with the proposed new state, nor by reason of its acceptance of such enactment as a term of admission, but solely because the power of Congress extended to the subject." In both of the last cited opinions the Supreme Court emphasizes the necessity for absolute equality in the terms upon which the several states become members of the United States of America. This court is unwilling to acknowledge that the congressional power, declared in the Seber case to be effective in Oklahoma, is to be denied operation in Nebraska, by virtue of any disparity in the enabling acts leading to the admission into the Union of the two states.

"The historically paramount power of Congress to legislate for and on behalf of its Indian wards", mentioned in Board of County Commissioners v. Seber, 10 Cir., 130 F.2d 663, 668, has been declared repeatedly in our constitutional history, quite without relation to any compacts with individual states. Cherokee Nation v. Georgia, 5 Pet. 1, 30 U.S. 1, 8 L.Ed. 25; Worcester v. Georgia, 6 Pet. 515, 31 U.S. 515,

8 L.Ed. 483; United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228; United States v. Rickert, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532; Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941. See the discussions of the origin and existence of the power in United States v. 4,450.72 Acres of Land, D.C.Minn., 27 F.Supp. 167, 172, 173, and in the same case on appeal, State of Minnesota v. United States, 8 Cir., 125 F.2d 636, 640. That power antedated the admission into the Union of states such as Oklahoma, and in its inception was subject to execution not only within territories not yet received into statehood, but within the sovereign states, even in the thirteen original states.

Arguing against the existence of the power of the United States, in the discharge of its function of guardianship over its Indian wards, to withdraw from state taxation, lands once upon the tax rolls of a state's taxing units and thereafter purchased for Indian wards of the National Government under restricted titles, the defendants cite United States v. Swain County, North Carolina, D.C.N. C., 46 F.2d 99, which, in an exhaustive opinion, denies such power within the original state of North Carolina. The defendants acknowledge that the cited case was reversed upon direct appeal, United States v. Wright, 4 Cir., 53 F.2d 300, 301, certiorari denied 285 U.S. 539, 52 S.Ct. 312, 76 L.Ed. 932, but insist that the reversal was premised on the actual ownership of the affected lands by the United States. That such ownership was affirmed by the circuit court and declared to be an adequate ground for reversal is true. But that is only one aspect of the circuit court's opinion which concludes a comprehensive analysis of the conservatorship over the Indians of the federal government with this emphatic assertion [53 F.2d 311]: "In the case at bar Congress has expressly exempted the lands in question from taxation; and, as these lands were paid for in part by the government * * * and in part by moneys which it paid to the Indians, it would seem that the exemption would be valid under the principle laid down by Mr. Justice Stone in the case last cited," i. e. Shaw v. Gibson-Zahniser Oil Corporation, 276 U.S. 575, 48 S.Ct. 333, 72 L.Ed. 709 (vide infra), "even though title had remained in the Indians and had not been conveyed to the United States." The reversal of the trial court's action was

actually an emphatic denial of the validity of the reasoning of the trial judge. Without analytical comment, it may simply be observed that the two cited opinions are thrown into illuminating perspective by certain subsequent cases and their appeals arising in the same district and circuit involving comparable constitutional attitudes and the same Indian group. (1) United States v. 7,405.3 acres of land, 4 Cir., 97 F.2d 417, reversing trial court; (2) United States v. Colvard, 4 Cir., 89 F.2d 312, reversing trial court; and (3) United States v. Parton, D.C.N.C., 46 F.Supp. 843; reversed, United States v. Parton, 4 Cir., 132 F.2d 886.

■ It is recognized, as the defendants here contend, that the imposition of restrictions upon the alienation or encumbrance of lands acquired as these have been is not alone effective to place them beyond the power of taxation by state agencies. The defendants correctly maintain that position on the authority of United States v. Mummert, 8 Cir., 15 F.2d 926; Work v. Mummert, 8 Cir., 29 F.2d 393; United States v. Mathewson, 8 Cir., 32 F.2d 745, all of which arose in the county in Nebraska that is now before the court. To the same effect are a series of opinions of the Supreme Court. McCurdy v. United States, 246 U.S. 263, 38 S.Ct. 289, 62 L.Ed. 706; United States v. Ransom, 263 U.S. 691, 44 S.Ct. 230, 68 L.Ed. 508, affirming United States v. Ransom, 8 Cir., 284 F. 108; Sunderland v. United States, 266 U.S. 226, 45 S.Ct. 64, 69 L. Ed. 259; and finally Shaw v. Gibson-Zahniser Oil Corporation, 276 U.S. 575, 43 S.Ct. 333, 334, 72 L.Ed. 709. But it is highly significant that in all those cases, and in many others of like import, it was declared, *not that the Congress did not possess the power* to withdraw the lands from taxation, *but rather that it had not theretofore exercised that power,* whose existence all of them inferentially, and several expressly, conceded. So, in Shaw v. Gibson-Zahniser Oil Corporation, supra, the court, speaking through the then Mr. Justice, now Chief Justice, Stone, said: "What governmental instrumentalities will be held free from state taxation, though Congress has not expressly so provided, cannot be determined apart from the purpose and character of the legislation creating them. * * * The end sought and the mode of attaining it adopted by Congress in the legislation providing for the welfare of Indians by setting apart, by allotment or otherwise, tribal lands or the public domain, restricted for their benefit, led to the conclusion that those lands and the uses of them were so intimately connected with the performance of governmental functions as clearly to require independence of all state control so complete that nothing short of an express declaration by Congress would have subjected them to state taxation. * * * In a broad sense all lands which the Indians are permitted to purchase out of the taxable lands of the state in this process of their emancipation and assumption of the responsibility of citizenship, whether restricted or not, may be said to be instrumentalities in that process. But they are far less intimately connected with the performance of an essential governmental function than were the restricted allotted lands, and the accomplishment of their purpose obviously does not require entire independence of state control in matters of taxation. * * * *There are some instrumentalities which, though Congress may protect them from state taxation, will nevertheless be subject to that taxation unless Congress speaks. * * * These lands we take to be of that character."* (Emphasis added)

Congress has now spoken. And in Board of County Commissioners v. Seber, 318 U.S. 705, 717, 63 S.Ct. 920, 927, 87 L.Ed. 1094, it is intimated that it spoke "as a result of the Shaw decision," and plainly stated that "The clear implication of the Shaw case is that those Acts are valid exercises of Congressional power and we so hold."

The power of Congress thus to legislate being affirmed, and having been exercised, certain conclusions follow which are effective to dispose of other positions taken here by the defendants.

■ One such conclusion is that the application of the acts within Nebraska can not be conditioned by the domestic law of Nebraska, whether of constitutional or of legislative origin. So, it is no valid objection to either act that it does not accord with one or another provision of the Constitution of Nebraska or of the Nebraska statutes.

■ Another reflection from Board of County Commissioners v. Seber, supra, 318 U.S. page 718, 63 S.Ct. page 927, may be quoted: "The fact that the Acts with-

draw lands from the tax rolls and may possibly embarrass the finances of a state or one of its subdivisions is for the consideration of Congress, not the courts." See also: Board of County Commissioners of Pawnee County, Oklahoma v. United States, 10 Cir., 139 F.2d 248. Practically applying this obviously correct principle, the court now announces that all items offered in evidence as bearing upon the financial consequence to Thurston County, Nebraska, and to those other governmental agencies for which it gathers taxes upon its real estate, of the removal of the lands and lots involved from its tax rolls (including stipulation, defendants' Exhibit 2, with its subsidiary exhibits; map of Thurston County, defendants' Exhibit 3; tabulation of relief payments in the county, defendants' Exhibit 4, and tabulation of appropriations for the years 1938 to 1942 inclusive of United States government moneys disbursed through the Indian agency located in Thurston County, as well as the oral testimony responsive to the same issue), are considered by the court to be wholly irrelevant and immaterial to any issue in this case. This court is powerless to determine the present issues upon general equitable principles. Considering that the Congress is clothed with a right to legislate in this field, which it has exercised, the justice or fairness of its exercise is beyond this court's proper inquiry. It is a legislative, not a judicial, consideration.

■ Nor is the defendant county entitled, in the name of equity, to defend against the plaintiff's demand for recovery of taxes exacted by it on the ground that it has allocated and distributed the taxes collected, in large part to the state, to municipalities and to school districts entitled to share ratably in the taxes which the county collects. It collected the taxes deliberately and coercively and with full knowledge that their validity was disputed; and it incurred the consequences of their distribution. Atchison, Topeka & Santa Fe R. Co. v. O'Connor, 223 U.S. 280, 287, 32 S.Ct. 216, 56 L.Ed. 436, Ann.Cas.1913C, 1050; Ward v. Board of Com'rs of Love County, Oklahoma, 253 U.S. 17, 24, 40 S. Ct. 419, 64 L.Ed. 751.

■ The defendants' general statement that it is beyond the power of the United States after it has once issued a patent in fee simple to land within a state's boundaries, to withdraw that land from state taxation may not be admitted without reservation or distinction. If the withdrawal be a separate and isolated act the position of the defendants is well taken. But if it be an incident appropriate to the exercise of an undoubted federal power, then the defendants' contention must fall. Board of County Commissioners v. Seber, supra.

After the affirmance of the constitutionality, and the operation within Nebraska, of the action of Congress in the passage of the statute involved and of its amendment, certain other particulars remain for consideration and determination. They will be mentioned briefly.

■ The fact that the restrictions upon alienation in the chains of title to the properties here involved were formally imposed by previous individual owners is insignificant. The imposition in each instance was at the behest and under the direction of the United States through its duly constituted authorities charged with the administration of Indian affairs. It was no concern of the grantors, who were mere instruments of the federal government in prescribing the restrictions, which were not for their benefit and conferred or reserved no rights of reentry in their favor but rather were responsive to federal legislation and administrative policy. Like origin of restrictions has not been regarded as a barrier to their validity in the cases hitherto cited, or made an obstacle to the applicability of the statutes under examination.

■ Neither is the acknowledged failure of the plaintiff to follow the formal requirements of the statutes of Nebraska, C.S.Neb.1929, Sec. 77-1923, a barrier to its recovery of the taxes paid. The county authorities in nearly all instances were formally notified that the taxes assessed were being paid unwillingly and under claim that they were being unlawfully exacted in view of the statutes under which this suit is brought. However, the strict Nebraska statutory procedure incident to payment under protest and filing a claim with the county board was not pursued. The United States is not required in cases of this character to follow the state's statutory procedure erected for employment by individuals for recovery of taxes paid, or to subject itself to the jurisdiction of the state boards and courts. Seber v. Board of County Commissioners, D.C., 38

F.Supp. 731; Board of County Commissioners v. Seber, 10 Cir., 130 F.2d 663; United States v. Board of Com'rs of Osage County, Oklahoma, 251 U.S. 128, 40 S.Ct. 100, 64 L.Ed. 184, 189; Carpenter v. Shaw, 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478; Board of Com'rs of Jackson County, Kansas v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313; Muskogee County, Oklahoma v. United States, 10 Cir., 133 F.2d 61; United States v. Dewey County, S.D., D.C.S.D., 14 F.2d 784; Board of County Commissioners of Caddo County v. United States, 10 Cir., 87 F.2d 55; United States v. Nez Perce County, Idaho, 9 Cir., 95 F.2d 232; Bryan County, Oklahoma, v. United States, 10 Cir., 123 F.2d 782; Board of County Commissioners of Pawnee County, Oklahoma v. United States, 10 Cir., 139 F.2d 248.

In determining for what years the lands involved are within the protection of the acts, two considerations arise: First, as of what date within a given year does Nebraska real estate become finally subject to taxation for that year? (for it seems to be unquestioned between the parties as well as the settled rule, that this point is governed by Nebraska law); secondly, in applying the amendatory act of May 19, 1937, Title 25 U.S.C.A. § 412a, is the operation of the exemption deferred until the completion and filing of the statutory designation of homestead? These points will be considered separately.

Under the statutes of Nebraska, all real estate subject to taxation is required to be assessed at its actual value on the first day of April, C.S.Neb.1941 Supp. Section 77-1601; but the actual levy of taxes can not possibly occur until after the completion of the work of the state board of equalization and assessment and the certification to the county board of the state rates of taxation (which can not happen until after July 1, but does take place before July 10, Section 77-1707), and ordinarily is made after August 1st, Section 77-1801 in association with Article 10, Chapter 77, C.S.Neb.1929; and taxes upon real estate become a lien upon the land only on the first day of January of the year following the year for which they are levied. C.S.Neb.1941, Supp. Section 77-1959. There is no precise statutory prescription of a day as of which liability for tax in a given year finally attaches to Nebraska real estate. The prevailing opinion

among Nebraska lawyers dealing with the subject of real estate may be said to be that liability to taxation, as distinguished from the lien of the tax, attaches as of the statutorily flexible time of the actual levy. The Supreme Court of Nebraska seems to have confirmed that view. State ex rel. Hinson v. Nickerson, 99 Neb. 517, 156 N. W. 1039; Hardin v. Pavlat, 130 Neb. 829, 266 N.W. 637. In the former case lots within the municipality of Beaver City on April 1, 1913 were detached from it by decree of court on July 1, 1913 before the making of the levy of taxes for 1913. The Supreme Court denied their liability for municipal taxes for 1913, saying among other things [99 Neb. 517, 156 N.W. 1040]: "When it is a question of power to tax, that power must exist when it is assumed to exert the power; that is, when the property is taxed. The property is taxed by the city when the city levies the tax." In the latter case real estate had been disconnected by judicial decree from the village of Dalton on June 23, 1931. In citing and following the previous case, the Supreme Court of Nebraska held that the real estate was not subject to village tax for 1931 and added [130 Neb. 829, 266 N. W. 641]: "The record shows that the 1931 taxes were levied by the county board of Cheyenne county on August 4, 1931. Clearly, therefore, the property of these plaintiffs was not subject to the taxes for 1931 and subsequent years." It follows that since in Nebraska liability of real estate for taxation for a given year is determined as of the date of the actual levy, which, for 1936, could not in any event have preceded the effective date of the Act of June 20, 1936, the lands involved in respect of which the issue arises are all discharged from liability under that act for the year 1936, and that upon the like reasoning the amendatory act of May 19, 1937, controls for the year 1937 and subsequent years.

The act of May 19, 1937, operated, among other ways, to narrow the exemption from state taxation from "all lands" to "all homesteads" with specific definition and limitation. Inasmuch as the formal selections by the owners, approvals of the Secretary of the Interior, and the filing of the designations thus made occurred at varying intervals after May 19, 1937, and even after the last possible date for levying taxes for 1937 and some after like date in 1938, though in each instance

before the collection of the taxes involved, the court naturally inquires whether that delay operates to deny the immediate effectiveness for 1937 and thereafter of the act of May 19, 1937. If the question were an open one the writer of this opinion would have grave doubt about it. But it appears to be settled by persuasive authority in favor of the plaintiff. Zweigel v. Webster, D.C.Okl., 32 F.Supp. 1015; Seber v. Board of County Commissioners, D.C., 38 F.Supp. 731; Muskogee County, Oklahoma v. United States, 10 Cir., 133 F.2d 61; Board of County Commissioners of Pawnee County Oklahoma v. United States, 10 Cir., 139 F.2d 248. In this connection, the court does not overlook Note 12 to the opinion of the Supreme Court in Board of County Commissioners v. Seber, supra (see 318 U.S. at page 712, 63 S.Ct. at page 924) by which the relation back of the Secretary's approval may be construed as limited to the date of the designation. The question here immediately considered was not before that court, so the note can not be considered as explicitly negativing the immediate effectiveness of the act. The prevailing opinion is that a completed designation before the final coercive exaction of the tax is operative to secure the benefits of the act from its otherwise effective date; and this thought is in harmony with the mandate for the liberal construction of acts of this character in favor of their Indian beneficiaries.

Without specifically identifying the affected counts, the court now notices a contention by the defendants that several of the tracts can not be regarded as "homesteads" and on that account must be denied the benefits of the Act of May 19, 1937. That issue is maintained in the way of evidence by a stipulation or memorandum (defendants' Exhibits 1 and 1–a) from which it appears (a) that some of the claimants are not heads of families; (b) that in one instance the exemption is claimed for separate non-contiguous tracts; (c) that some of the claimants do not reside on the land involved; (d) that in several instances there are more than one claimant, and in one, a tenant in common who has also a claim under another cause of action; (e) that some of the land is unimproved. Without more detailed report of the analysis which the court has made, the court upon this point directs that the actual facts as disclosed in the exhibits be formally embodied in the several findings of fact.

However in appraising their legal consequence, the court considers that under the Act of May 19, 1937, the foregoing facts do not negative the exemption claimed. The defendants' position is that to be a "homestead" each parcel of property must come within the definition of a "homestead" under the statutes of Nebraska. They are not explicit as to whether the test to be imposed is that defined in the statute governing exemptions from execution, C.S.Neb.1929, Section 40-101, or that contemplated in the statutes touching the alienation of the homestead of a married person, Section 40-104, or those governing the descent of the homestead on the death of its owner, Section 40-117, and Chapter 30. For without unnecessary particularity, it may be noted that even in the single jurisdiction of Nebraska the definition of a "homestead" is not constant and varies widely, depending upon the purpose of the particular protective statute. In Nebraska, it is true, all definitions involve occupancy of the premises by the claimant at the critical date, and his status as the head of a family, and the contiguity of the land protected.

Homesteads, as they are understood in our modern American law, were unknown to the common law. They are creatures of statute, and of the statutes of the several governmental entities creating them. As such, subject only to controlling constitutional limitations, they may be identified and defined as the legislature may determine. Thus, it comes about that the variety of definitions of the term "homestead" is limited only by the number of defining jurisdictions; and within the same jurisdiction (vide supra) the term may be variously defined for different purposes. In this situation, the employment of the term in federal legislation can hardly be construed as permission for its construction in ways as numerous as the states in which it is effectively applied. Like the several state legislatures, the Congress may, for its purpose, give the term its own definition, and it has done that in this instance. To meet its present test the land must, (a) have been purchased before May 19, 1937 out of the trust or restricted funds of individual Indians; (b) be held subject to restrictions against alienation or encumbrance except with the approval of the Secretary of the Interior; (c) be selected for designation as a homestead by its owner or owners with the approval of the

Secretary of the Interior; (d) be not more than a total of one hundred and sixty acres in extent, if agricultural and grazing lands, or cost not more than $5000, if urban property. It is beyond the power of state legislation either to dispense from the rigor of that definition or to add to it. And such has been the consistent judicial holding, both generally and in the application of this act. Sperry Oil & Gas Co. v. Chisholm, 264 U.S. 488, 44 S.Ct. 372, 68 L.Ed. 803; Sperry Oil & Gas Co. v. Chisholm, 8 Cir., 282 F. 93, 99; in which it is said: "The use of the words 'homestead' and 'surplus' in allotments made to Indians was in order to classify the lands. The real homestead which a citizen of Oklahoma is entitled to is created by the laws of the state"; Muskogee County, Oklahoma v. United States, 10 Cir., 133 F.2d 61. That occupancy for the purposes of a home is quite generally an imperative connotation of the term "homestead" under the debt exemption statutes of the several states may be recognized. But as employed in reference to Indian allotment statutes of the United States, the term generally implies not actual and permanent occupancy, but rather continuing availability for employment as a home.

■■■ The plaintiff prays for interest on the several items of taxes paid from the respective dates of their payment. Interest will be allowed only from date of entry, upon the judgments, which will be for the face of the several amounts actually paid. This is in accordance with the thought of Board of County Commissioners v. Seber, 10 Cir., 130 F.2d 663, 671, which, in turn, rests upon Bryan County, Oklahoma v. United States, 10 Cir., 123 F. 2d 782, and with greater finality upon Board of Com'rs of Jackson County, Kansas v. United States, 308 U.S. 343, 352, 353, 60 S.Ct. 285, 84 L.Ed. 313. The considerations of equity which, in the final analysis, controlled the course of decision in the case last cited are certainly not wholly wanting here. And this court has no more difficulty in observing them than was encountered by the circuit court of appeals for the tenth circuit, in applying these statutes in Board of County Commissioners v. Seber, supra. In fairness to the defendants it must be recognized that the controlling decisions upon which this memorandum chiefly rests its affirmance of the constitutionality of the statutes now enforced have been rendered since the taxes were paid for which recovery is here claimed.

■■■ The property involved in Count IV of case No. 247 is urban in character and cost $5300. In respect of it the plaintiff seeks prospective relief in all particulars only to the extent of fifty-fifty-thirds of its taxable value and for denial of validity, and recovery, of a like proportion of taxes paid upon it for the years 1937 and 1938. No claim is made in that count for the recovery of taxes for 1936. The question naturally arises whether the statutory limitation of $5000 in the amendatory act of May 19, 1937, Title 25 U.S.C. A. § 412a, is to be construed as forbidding any exemption whatsoever in respect of urban real estate costing more than that amount, or as imposing a maximum exemption base with the consequence that urban property costing more than $5000 will be exempt only in the proportion of its assessed valuation which $5000 bears to its total initial cost. The latter alternative was resolved upon in United States v. Nez Perce County Idaho, D.C.Idaho, 50 F. Supp. 966, in applying this statute in a comparable situation. This court is of the opinion that the conclusion thus reached conforms to the canon of liberality in the construction of acts of this nature by which the court must be governed. It accords also with the general judicial attitude whereunder, in the absence of language indicating a contrary legislative intent, statutes allowing exemptions of varied kinds in respect of property, but prescribing a maximum valuation within which the privilege will be allowed, are construed as granting the privilege to more valuable property to the extent of the limitation and denying it for the excess in valuation.

In Count VIII of case No. 299 it appears that the restrictions upon alienation or encumbrance have been removed upon the condition of the making of a conveyance which has not yet been made, and whose execution may not actually happen, or may occur at a presently undeterminable date. Care will be taken that appropriate findings and conclusions are made upon this point and the decree will limit prospective injunctive relief to the date on which the condition to the effectiveness of the removal of restrictions shall mature, or congress shall allow taxation.

Certain historical variations and obvious inadvertences, as pleaded and stipulated in case No. 246, have been noted. They

may be carefully set out in the findings; and, as the court does not consider that they necessitate any essential distinction in result from the other cases, the general position taken by the plaintiff will be approved, and the relief prayed, except as to interest, will be granted.

Counsel for the plaintiff will promptly prepare in each case and upon each count, appropriate and detailed findings of fact and conclusions of law and a judgment in accordance with this memorandum according to the plaintiff the relief prayed for, except as to interest before judgment for taxes recovered, and submit the documents thus prepared to counsel for the defendants for approval, and then to the court for entry; or if the same be not approved, then, upon at least five days' notice in writing to counsel for the defendants, to the judge sitting at Lincoln, for settlement. Factual details too numerous for incorporation into this memorandum will be preserved in the findings. Exceptions will be allowed.

The original of this memorandum is being filed in Case No. 235. It may be considered as equally applicable (except for specific details) in Cases Numbered 246, 247 and 299, in each of which a mere notation to it is being filed.